## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

MARY WEBB, et al.,

                 Plaintiff,

v.                                  CIVIL ACTION NO.  5:09-cv-01253

RALEIGH COUNTY SHERIFF'S
DEPARTMENT, et al.,

                 Defendants.

### MEMORANDUM OPINION AND ORDER

The Court has reviewed Defendant John Hajash's Motion for Summary Judgment [Docket 31], Defendant Greg Kade's Motion for Summary Judgment [Docket 37], and the Motion for Summary Judgment of Defendants Danny Moore, Raleigh County Commission, Raleigh County Sheriff's Department and Steve Tanner [Docket 39].  After careful consideration of the supporting memoranda, responses and replies, the Court **GRANTS** in part and **DENIES** in part the above motions.

### I.  FACTUAL BACKGROUND

In addition to being the eve of Independence Day, July 3, 2006, was two days after Robert Webb's birthday.  Mr. Webb lived with his wife, Plaintiff Mary Webb, and two daughters at 251 Cabell Heights Road, Beckley, Raleigh County, West Virginia.  Late that evening and into the early

morning of July 4, 2006, Mr. Webb was playing music loudly and discharging a firearm at no particular target.[1]  Plaintiff has testified that it is not uncommon for Mr. Webb and others in the neighborhood to discharge firearms around the Fourth of July.  (Webb Dep. 39-40, Sept. 2, 2009). Earlier that evening the Webbs had cooked out, Mr. Webb played and swam with his daughters, and Plaintiff and one of their daughters, Samantha Webb, went inside.  (Webb Dep. 26-28)  Until about 10:00 p.m. or 11:00 p.m., Mr. Webb was also in the company of his neighbors, Chris Hatfield and Kristi Hatfield (now Kristi Richmond).  (Hatfield Dep. 21-22, Nov. 19, 2009).  The Webb's other daughter, Amanda Webb, remained outside with her father until around 1:00 a.m.  (Webb Dep. 29-30).  Although Plaintiff claims that she never saw Mr. Webb consume alcohol or marijuana that night, Mr. Webb's autopsy report shows that he had a blood alcohol level of .22 at the time of his death.[2]  (Webb Dep. 30-31; Autopsy Report 8).

At 12:09 a.m. on July 4, 2006, Amy Smith, a neighbor of the Webbs, called the Raleigh County Sheriff's Department on its administrative line to complain that Mr. Webb was "shooting a gun at his house" with what she assumed was a pistol or a shotgun.  (Raleigh Cty. Sheriff's Dep't Commc'n Line Tr. 1, July 4, 2006, 12:09 a.m.).  Ms. Smith called the administrative line as opposed

---

[1]Although originally thought to be a pistol, it does not appear to be disputed that the subject firearm was what is referred in the briefing as an AK-47.

[2]Plaintiff testified in her deposition that she was aware that her husband occasionally consumed marijuana but that she had not seen her husband consume any within the year of his death. (Webb Dep. 31).  She further stated that although she was aware of his blood alcohol level at the time of his death as shown in the autopsy report, either she or one of her daughters was in his company that night up until 1:00 a.m., and Mr. Webb never consumed alcohol in front of her or her children.  (Webb Dep. 35).  The Webb's neighbor, Kristi Richmond (at the time Kristi Hatfield) testified that she had seen Mr. Webb drink excessively on occasion and around his family. (Richmond Dep. 11, Nov. 19, 2009).

to 911 because she wished to remain anonymous to avoid repeated threats to her by Mr. Webb. (Smith Statement 53-54, July 23, 2009).

Deputy John Hajash, who was on duty that night, heard the dispatch of the complained-of conduct and informed the operator by radio that he would be responding to the complaint.  He was in the company of  Deputy Greg Kade, who was not on duty but working security at a Holiday Inn construction site in full uniform and in possession of his cruiser.  (Kade Dep. 26-29, June 19, 2009). Deputy Kade informed the operator by radio that he would accompany Deputy Hajash to the Webb residence on Cabell Heights Road.  (Raleigh Cty. Sheriff's Dep't Commc'n Line Tr. 2).  Deputy Hajash has testified that he considered this call an emergency call because there was shooting involved.  (Hajash Dep. 53, June 19, 2009).  The two deputies left in separate cruisers going to Mr. Webb's address, keeping in contact with each other and the operator for directions.  They employed the lights and sirens on their cruisers until they got within proximity of the house.  (Kade Dep. 39-41).  The operator called Mrs. Smith back to get a description of Mr. Webb, confirm he was still outside and confirm the location of his residence.  (Raleigh Cty. Sheriff's Dep't Commc'n Line Tr. 3-5).  Mrs. Smith informed the operator that Mr. Webb had a wife and two children who were likely inside the house, and that Mr. Webb had a blue Chevy pickup truck parked at the house.  (Raleigh Cty. Sheriff's Dep't Commc'n Line Tr. 5).

Deputy  Hajash and Deputy Kade parked their vehicles about one quarter mile from Mr. Webb's residence and proceeded to his house on foot down Cabell Heights Road.  (Kade Dep. 42). Deputy Kade carried a Remington 870 shotgun at "low ready" position and was wearing a protective

vest.[3]  (Kade Dep. 71).  Deputy Hajash carried a pistol and was also wearing a protective vest.

(Hajash Dep. 66).  On their way, the deputies became aware that there was loud music coming from

Mr. Webb's property and that someone was walking around outside his house.  (Kade Dep. 50).  The

deputies first  attempted to enter Mr. Webb's property through a gate, but the gate was padlocked.

(Kate Dep. 49; Hajash Dep. 74).  They turned right on an adjoining street, Primrose Lane, and

walked to an area of that street that was in front of the Webb's property and in view of Mr. Webb's

pickup truck.  (Kade Dep. 55).  At that point, Deputy Hajash removed his weapon from its holster.

(Hajash Dep. 149).  Their view was obstructed by shrubbery at first, but there was a streetlight or

utility light illuminating the driveway area.  (Kade Dep. 55).  As the deputies passed the shrubbery,

they observed Mr. Webb walk from his truck to his garage at least once.  (Hajash Dep. 75-76).  After

he returned to the truck, the music, which had been coming from the truck, stopped.  The deputies

heard Mr. Webb say "What the hell" and they saw him lean inside the cab of the truck.  (Kade Dep.

57; Hajash Dep. 77).

At that time, the deputies positioned themselves behind the truck, still standing in the street,

between  ten (10) and thirty (30) feet away from Mr. Webb.  In that position, Deputy Kade was

behind and to the left of the truck with a full view of Mr. Webb leaning inside the cab, and Deputy

Hajash was to Deputy Kade's right, directly behind the truck with an obstructed view of Mr. Webb.

(Hajash Dep. 79-80).  Deputy Hajash could see only Mr. Webb's upper torso.  (Hajash Dep. 80).

Deputy Kade announced "Police, let us" or "let me see your hands" at a high volume that he

estimates could have been heard within 20-25 yards.  (Kade Dep. 64-65).  However, Plaintiff and

---

[3]Deputy Kade describes "low ready" as both hands on the gun at waist level, with the muzzle
pointing down.  (Kade Dep. 59).

her neighbors dispute that the deputies announced their presence at all because they claim they would have been able to hear the announcement. From her neighboring home, through open windows, Kristi Richmond could hear the music from Mr. Webb's truck and she could tell he was talking with his daughter at points during the evening, but neither she nor Chris Hatfield, her husband, heard the deputies announce themselves. (Richmond Dep. 31, 32, 59; Hatfield Dep. 31). Plaintiff states that the windows of her house were open but she did not hear the officers announce themselves either. (Webb Dep. 55).

Regardless, both deputies had their weapons pointed at Mr. Webb. (Hajash Dep. 82-83). Upon realizing the deputies' presence, Mr. Webb stepped away from his truck and turned to face the deputies. According to Deputy Kade and Deputy Hajash, Mr. Webb held an AK-47 rifle in both hands in a firing position, pointed in their direction, or being raised to that position.[4] (Kade Dep.

---

[4]Plaintiff disputes the fact that Mr. Webb held the rifle when he was approached by the officers:

> A: I know my daughter [Amanda] knows where the gun was, when she was out there with her father, and I know when we seen the pictures the gun was in the same spot.
> Q: The gun was in the same spot that it was when she was out there with her father?
> A: Yes.
> Q: So the gun was laying in the driveway when she was out with her father?
> A: It was under the truck.
> Q: And so she believes that the gun was in the same spot as it was when she was out there?
> A: Yes. Because she knows exactly where the gun was when he laid it there.
> Q: Did she say why he had laid this loaded firearm under his truck?
> A: After he was shooting the gun, they went back to the truck because they were going to come into the home, she was sitting on the truck and he laid the gun underneath the truck because she told me he said, 'I don't want you tripping over this gun,' so he laid it underneath the truck. Because she was just, like, you know, everywhere bouncing around, so he laid it underneath the truck. And she said her daddy said, 'I will lay it underneath the truck so you don't trip over it,' and that's where it was when she went in the house.

(Webb Dep. 67-68).

67-68; Hajash Dep. 84).

Upon seeing Mr. Webb's firearm, Deputy Kade and Deputy Hajash fired their weapons at him either simultaneously or in the close order of Deputy Kade then Deputy Hajash.[5]  (Kade Dep. 71; Hajash Dep. 84-85).  Deputy Kade immediately fired one shot and Deputy Hajash fired two. (Kade Dep. 71-72; Hajash Dep. 85).  Mr. Webb fell to the ground immediately upon  impact of the initial shots.  (Kade Dep. 72).  On the ground, the deputies observed him roll.  Deputy Kade saw that he no longer held his firearm, but Deputy Hajash did not and fired another shot, whereupon Deputy Kade told him to stop firing.[6]  (Kade Dep. 73).  Once Mr. Webb fell, Deputy Kade no longer perceived him as a threat.  (Kade 73-74).

Deputy Hajash states that he could only see Mr. Webb's shoulder after he fell to the ground, and "it looked like he was still holding the rifle."  (Hajash Dep. 88).  He stated in his deposition,

> He fell to the ground after he was shot.  I believe my bullet hit him when he was still standing.  And he fell to the ground and started rolling and all I could see was his - - I think it was his feet or something.  I don't remember what it was.  But he was rolling to the other side like he was going to start shooting at our feet from under the vehicle and that's when I fired one more shot and then I could see his hands after that shot was fired.[7]

---

[5]At one point during his deposition, Deputy Hajash stated that there was a pause of about two seconds after Mr. Webb turned to face them and before they began shooting.  (Hajash Dep. 96 ("He turned and he was stopped and had the rifle down and looked at Kade like he knew where he was going to aim the rifle and then raised it.")).  This pause is not supported elsewhere in his deposition where he retells the same facts, nor is it supported by Deputy Kade's testimony or either officers' statements made two days after the incident.  (Hajash Dep. 84-85; Kade Dep. 71).

[6]Deputy Kade told Detective Canaday in his statement following the incident that he does not remember a pause in between the shots fired, and the shots were all fired in succession.  (Kade Statement 4, n.d.).

[7]Deputy Hajash's statement, "all I could see was - - I think it was his feet or something," is incongruous with his statement that he could only see Mr. Webb's shoulder.  The conflicting testimony is perhaps resolved by the explanation that from Deputy Hajash's perspective it looked

(continued...)

(Hajash Dep. 86).

Deputy Hajash and Deputy Kade immediately radioed a call for medical assistance.  (Kade Dep. 74; Hajash Dep. 92).  Deputy Hajash approached Mr. Webb's body and observed that he was not breathing, but did not touch it or verify Mr. Webb's death.  (Hajash Dep. 92).  The AK-47 was on the ground by Mr. Webb's feet below the driver's side door.  (Hajash Dep. 101-102).  Neither deputy checked or touched the weapon.  (Hajash Dep. 103).   Deputy Hajash then went into the garage with his gun drawn and flashlight in hand to make sure no one else was there.  (Hajash Dep. 99).  While they were waiting on the EMS, Plaintiff came out of the house and demanded to know what happened.  Deputy Kade asked her to return to her house and Deputy Hajash told her to go back inside and that they would be with her in a moment.  (Kade Dep. 81; Hajash Dep. 100).  Plaintiff again asked what was going on and Deputy Hajash repeated his order.  (Hajash Dep. 101).  At that point she looked over and saw her husband's body in her driveway and asked the deputies who shot whom.  (Hajash Dep. 101).  Plaintiff went back inside and called her neighbor, Kristi Richmond, on the telephone.  (Webb Dep. 60).  The neighbor told her that Mr. Webb was lying on the ground outside the house.  (Webb Dep. 60).  Plaintiff then went back outside to ask the deputies if her husband was hurt and one of them responded that he was dead.  (Webb Dep. 60).

In the moments following the shooting, the Webb's neighbor from across the street, Chris Hatfield, exited his house, told his dog to "shut the hell up" and went back inside.  (Hajash Dep. 104).  About eleven people arrived at the scene, including Sheriff Moore, Lieutenant Williams, Deputy Bircham, Chief Steve Tanner, Detective Larry Lilly, Detective Jimmy Canaday, Jim Bare

---

[7](...continued)
like "he was laying on his back and was going to start shooting towards his feet."  (Hajash Dep. 88).

and two or three "EMS people." (Kade Dep. 82-83; Hajash Dep. 105). Chris Hatfield, Kristi Richmond and members of the Webb's family joined the scene as well. (Webb Dep. 63). The additional law enforcement parked their vehicles directly in front of the Webb's house. (Hajash Dep. 109). Plaintiff stated in her deposition that she asked Sheriff Moore why his deputies had to shoot her husband and he told her that his men had families to go home to. (Webb Dep. 57-58). When the EMS personnel arrived, Deputy Hajash told them to let Deputy Bircham take a photograph of Mr. Webb before cutting his clothes off and tampering with the crime scene. (Hajash Dep. 107). When Lieutenant Williams arrived, he ordered Deputy Hajash to take down the names of the EMS people, and then he ordered Deputy Kade and Deputy Hajash to go back to their vehicles. (Hajash Dep. 108). Plaintiff recalls that the people from the Sheriff's department would not allow the EMS personnel to work on her husband. (Webb Dep. 61).

When Deputy Kade and Deputy Hajash got back to the Sheriff's office around 4:00 a.m., they gave brief statements about what occurred. (Kade Dep. 85; Hajash Dep. 111). They both gave another statement one or two days later, which statements were recorded and reduced to writing. (Kade Dep. 104; Hajash Dep. 11). Before returning to work, they were required to meet with Mike Johnson, a counselor used by the Sheriff's Department, who could clear them to return to work. (Hajash Dep. 118). Until then, they were placed on "administrative leave" for two or three days. (Kade Dep. 87).

At the time of his deposition, Deputy Kade was seeing someone of his choosing for counseling and pastoral services related to this event. (Kade Dep. 89-90). Deputy Hajash continued to see Mike Johnson one or two more times and another doctor who was not approved by the Sheriff's Department at least once. (Hajash Dep. 123, 125, 127). He immediately went back to

work for eight and a half (8½) months following the shooting, but he suffered from mental health problems relating to the incident and eventually went on medical leave. (Hajash Dep. 124). Deputy Hajash was terminated from the Sheriff's Department after he exhausted his twelve-week medical leave. (Hajash Dep. 135). After he went on medical leave but before he was terminated, Deputy Hajash tape recorded two conversations he had with Sheriff Moore and Deputy Tanner wherein the shooting and his medical leave were discussed. (Hajash Dep. 138-39). The record contains a transcript of one of these conversations between Deputy Hajash, his fiancée and Sheriff Moore.

The transcript reveals that in the conversation, Sheriff Moore tried to convince Deputy Hajash that it was not his shots that killed Mr. Webb and that his actions were appropriate given the situation. (Moore Hajash Conversation Tr. 5, 9, n.d.). He commented that Deputy Hajash had "technically done the world a favor." (Moore Hajash Conversation Tr. 8). Sheriff Moore recognized that Deputy Hajash's treating counselor or psychologist had written a letter opining that he was unfit for duty. (Moore Hajash Conversation Tr. 7). Deputy Hajash revealed to Sheriff Moore that he began seeing his own doctor after he could not get in touch with Mike Johnson because he had been having shooting dreams since the incident. (Moore Hajash Conversation Tr. 10-11). Sheriff Moore urged Deputy Hajash to "get over it" and get back in touch with Mike Johnson because the Sheriff's Department paid him and "he treats people like this." (Moore Hajash Conversation Tr. 9, 14). Sheriff Moore stated, "I don't know the man personally, never met him, never talked to him. But I know I got him to help people." (Moore Hajash Conversation Tr. 14). He told Deputy Hajash that if he did not find another doctor to oppose his doctor's opinion that he was unfit for duty, the Department would put him on sick leave until he could bring them verification that he was capable of returning to work. (Moore Hajash Conversation Tr. 24).

Sheriff Moore stated,

> You know, you go back, if it's just the dreams, you don't think it would - - you know, you need to speak up, take charge. You need to take charge. Just like you would if you went to a scene somewhere. You have to take charge. Say, "Doc, I'm having these dreams, and I don't think it will, you know," if you feel this way. If you don't think that will effect you doing you [sic] duties, tell him. Say, "I'm having dreams, but I don't think it's going to effect - - but I'm not scared to do my duty." And then if you don't, if you say, "Doc, I don't think I can do my duty," well, fine. That's between you and him. I'm not going to be judgmental here.

(Moore Hajash Conversation Tr. 30). Deputy Hajash is no longer employed at the Sheriff's Department. Deputy Hajash gave the taped conversations to two (2) third parties: Keith Harold and Bob McComas. (Hajash Dep. 141). Bob McComas disclosed the tapes to Plaintiff. (Webb Dep. 73). Deputy Hajash states that he was terminated while off on unpaid medical leave. (Hajash Dep. 132).

## II. PROCEDURAL HISTORY

Plaintiff initiated this action on May 6, 2008, in the Circuit Court of Raleigh County. On November 11, 2009, she filed an amended complaint, whereupon Defendants Raleigh County Sheriff's Department, the Raleigh County Commission, Sheriff Danny Moore, Chief Deputy Steve Tanner, and Deputy Greg Kade removed the case to this court based on federal question jurisdiction. (Not. of Removal ¶¶ 5-6).

The amended complaint [Docket 1-4] contains the following counts:

Count I - Wrongful Death
Count II - Suffering Prior to Death
Count III - Intentional Infliction of Emotional Distress
Count IV - Negligent Hiring, Training & Supervision
Count V - Negligence
Count VI - Tort of Outrage
Count VII - Punitive Damages

Count VIII - Strict Liability (Agency)
Count IX - Civil Conspiracy
Count X - Spoliation of Evidence
Count XI - Writ of Mandamus
Count XII - Attorney Fees
Count XIII - Violation of Civil Rights

Plaintiff requests the following relief:

A) Compensatory damages for medical expenses, lost wages, loss of earning capacity and all other such loss of services in a fair and just amount to be determined by a jury at trial;

B) General damages for past, present and future pain and suffering, mental anguish, permanent injury, inconvenience, loss of earning capacity, loss of society service and companionship, loss of enjoyment of life and emotional distress in a fair and just amount to be determined by a jury at trial;

C) Damages permitted and set forth pursuant to the West Virginia Wrongful Death Act, including:

      (1) Sorrow, mental anguish and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the decedent;

      (2) Compensation for reasonably expected loss of (I) income of the decedent and (ii) services, protection, care and assistance provided by the decedent;

      (3) Expenses for the care, treatment and emergency response personnel incident to the accident causing the death of the decedent; and

      (4) Reasonable funeral expenses.

D) Punitive damages, if it is determined that the Defendants or any one of the Defendants were grossly negligent, reckless and/or engaged in intentional misconduct;

E) Judgment of and from the Raleigh County Sheriff's Department and the individual Defendants in the form of an Order compelling the Defendants to comply with the adopted policies and procedures of the Raleigh County Sheriff's Department now and in the future.

F) Pre-judgment and post-judgment interest;

G) Costs and attorneys fees expended in this civil action; and

H) Any other further general or specific relief that the Court deems just and proper.

On August 31, 2010, Deputy Hajash filed his motion for summary judgment [Docket 31] on the grounds that he is shielded by qualified immunity and West Virginia's Governmental Tort Claims Act, West Virginia Code § 29-12A-5(a)(1)-(17), and that the force he applied was reasonable. Plaintiff responded on September 15, 2010, contending that Deputy Hajash is not entitled to immunity because his actions fell outside the scope of his employment and were not objectively reasonable. (Docket 43 at 9, 13).

Deputy Kade filed his motion for summary judgment on September 2, 2010, on the grounds that he, too, is entitled to immunity under West Virginia Code § 29-12A-5(a) because he is an employee of a political subdivision and he was acting withing the scope of his employment. (Docket 38 at 5-6). He also contends that he is entitled to qualified immunity, claims against him in his official capacity are redundant, plaintiff's claim for punitive damages is improper and the record contains no evidence to support plaintiff's state claims. Plaintiff responded on September 17, 2010, asserting that Deputy Kade is not immune under West Virginia Code § 29-12A-5(a) because his acts fell outside the scope of his employment, were with malicious purpose, in bad faith, or in wanton or reckless manner. (Docket 46 at 11). Plaintiff also asserts that Deputy Kade is not entitled to qualified immunity because his actions were not reasonable. (Docket 46 at 16). Plaintiff further responds that punitive damages may be awarded against employees under West Virginia Code § 29-12A-7(a), and she contests Deputy Kade's statement that the record does not contain evidence supporting her state claims. (Docket 46 at 17-18).

On September 2, 2010, Defendants Danny Moore, Raleigh County Commission, Raleigh County Sheriff's Department and Steve Tanner filed their motion for summary judgment. [Docket 39]. In it, they assert that the Sheriff's Department and the County Commission are provided

statutory immunity under West Virginia Code § 7-14A-4 and West Virginia Code § 29-12A-4.[8]
(Docket 40 at 7).  The Defendants state that Plaintiff's § 1983 claim also fails against the County
Commission because there is no evidence of a policy or custom enacted by that entity which led to
the violation of civil rights.  (Docket 40 at 9).  The Defendants assert further that Sheriff Moore and
Chief Deputy Tanner are entitled to summary judgment because West Virginia Code § 7-14A-4
precludes recovery against Sheriff Moore inasmuch as Deputies Hajash and Kade were not acting
under his immediate personal supervision, and neither defendant can be held liable for the wrongful
actions of their subordinates.  (Docket 40 at 11).  The Defendants also state in their motion that any
claims against the individual defendants in their official capacities are redundant and must fail,
Plaintiff's claim for punitive damages is improper under West Virginia law, and the record lacks
evidence to support Plaintiff's state law claims.  (Docket 40 at 13).  Plaintiff concedes that she has
not pled her civil rights claim against the Raleigh County Commission.  (Docket 45 at 14).  As to
her claims against the individual defendants in their official capacities, Plaintiff does not raise any
new objections or defenses to that issue that were not previously included in her response to
Defendants' motion to dismiss.  (Docket 45 at 15).

On September 17, 2010, Plaintiff responded stating that the Defendants have misinterpreted
and misapplied the law upon which they rely to relieve the Sheriff's Department and the County
Commission of liability, and West Virginia Code § 29-12A-4-(c)(2) holds the Sheriff's Department

---

[8] In their memorandum supporting their Motion for Summary Judgment [Docket 40],
Defendants contend that the Sheriff's Department is entitled to summary judgment.  Inasmuch as
the Court found that the Sheriff's Department is not an entity capable of being sued, and all counts
against the Sheriff's Department were dismissed on September 16, 2010, it is unnecessary to address
summary judgment arguments with respect to the Sheriff's Department.  *See Webb v. Raleigh
County Commission*, No. 5:09-01253, slip op. at 13 (S.D. W. Va. Sept. 16, 2010).

and the County Commission liable for the negligent acts of their deputies.  (Docket 45 at 9-11).

Plaintiff further responds that punitive damages may be awarded against employees under West

Virginia Code § 29-12A-7(a), but concedes that they are inappropriate against the Raleigh County

Commission, and she contests the Defendants' position that the record does not contain evidence

supporting her state claims.  (Docket 46 at 17-18).


### III.  STANDARD OF REVIEW


The well-established standard in consideration of a motion for summary judgment is that

summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the movant

is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c)(2); *see also Hunt v. Cromartie*, 526

U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty

Lobby, Inc.*, 477 U .S. 242, 247 (1986).  A "material fact" is a fact that might affect the outcome of

a party's case.  *See Anderson*, 477 U.S. at 248; *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*,

264 F.3d 459, 465 (4th Cir.2001).  A "genuine" issue concerning a "material" fact arises when the

evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor.

*Id*.  The moving party bears the burden of showing that there is no genuine issue of material fact,

and that it is entitled to judgment as a matter of law.  *Celotex Corp.*, 477 U.S. at 322-23.

When determining whether there is an issue for trial, the Court must view all evidence in the

light most favorable to the non-moving party.  *North American Precast, Inc. v. General Cas. Co.

of Wis.*, No.02:04-1306, 2008 WL 906334, *3 (4th Cir. Mar. 31, 2008).  The nonmoving party must

satisfy its burden of proof by offering more than a mere "scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. If the non-moving party fails to make a showing sufficient to establish the existence of an essential element, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23. If factual issues exist that can only be resolved by a trier of fact because they may reasonably be resolved in favor of either party, summary judgment is inappropriate. *Anderson*, 477 U.S. at 250.


## IV. DISCUSSION


A.      Plaintiff's Section 1983 Claim


1.      Deputy Hajash's and Deputy Kade's Entitlement to Qualified Immunity


The Doctrine of Qualified Immunity "shields government actors from liability if they establish either that (1) the plaintiff's allegations fail to make out a violation of a constitutional right, or (2) the right at issue was not clearly established at the time of the alleged misconduct." *Henry v. Purnell*, 619 F.3d 323, 332 (4th Cir. 2010) (citing *Pearson v. Callahan*, --- U.S. ----, 129 S.Ct. 808, 815-16, 172 L.E.2d 565 (2009)). If Deputy Hajash and Deputy Kade acted objectively reasonable, then there would be no constitutional right violated and Plaintiff's federal claims would be invalidated as a matter of law. *Henry*, 619 F.3d at 332.

In her complaint, Plaintiff asserts violations of Mr. Webb's "civil rights." In her responses

to Deputy Kade's and Deputy Hajash's motions for summary judgment, she indicates that her federal claim is one of "violation of due process rights/excessive force." (Docket 43 at 8; Docket 46 at 15). The excessive force claim is ostensibly under the Fourth Amendment to the United States Constitution. Plaintiff, in her responses, delineates the "objective reasonableness" which the Court must use in analyzing an excessive force claim, but fails to discuss any standard by which the due process claim must be analyzed. It is unclear from the complaint and her responses to which of the deputies' actions Plaintiff is attributing a due process violation. However, in her Amended Complaint under the Civil Rights Violation count, she alleges that Deputy Hajash and Deputy Kade failed to determine Mr. Webb's vital signs or render medical aid to Mr. Webb following the shooting and that they denied emergency medical personnel immediate access to him. (Amd. Compl. ¶¶ 96-98).

Inasmuch as the only discussion of qualified immunity in the summary judgment briefing relates to excessive force and the shooting of Mr. Webb, the Court cannot determine that Deputy Hajash or Deputy Kade are immune for their actions regarding Mr. Webb's medical care following the shooting, which may amount to a violation of due process. Thus, the Court confines its discussion of qualified immunity to the Plaintiff's excessive force claims.

To establish a violation of the Fourth Amendment right to be free from seizures effectuated by excessive force, Plaintiff must show that the seizure was unreasonable, which inquiry is based on the "perspective of a reasonable officer" in the same circumstances. *Henry*, 619 F.3d at 332 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Deputy Hajash contends that only the deputies' acts at the moment force was used are relevant to determine reasonableness and all acts prior should not be considered. (Docket 32 at 4).

16

In support, he cites two Fourth Circuit opinions: *Elliott v. Leavitt*, 99 F.3d 640 (4th Cir. 1996) and *Greenridge v. Ruffin*, 927 F.2d 789 (4th Cir. 1991). This limitation would require the Court to disregard all of the actions the officers took leading up to the moment that they faced Mr. Webb, and focus solely on the instant when they believed Mr. Webb was aiming an AK-47 at them.

In *Greenridge*, the defendant officer approached a vehicle which a prostitute had entered with a man. *Greenridge*, 927 F.2d at 790. The officer opened the car door, identified herself and ordered the passengers to place their hands in view. *Id.* When the passengers did not comply the officer pointed her revolver into the vehicle. *Id.* When the officer saw the man reach for a long cylindrical object, which she believed to be a gun, she fired, shooting and permanently injuring the man. *Id.* The object was, in fact, a nightstick. *Id.* The district court excluded evidence that the officer's conduct before the arrest violated police procedures. *Id.* at 791. After a jury verdict in favor of the officer, the plaintiff appealed to the Fourth Circuit.

Our Court of Appeals examined the *Graham* test for reasonableness and emphasized that the "reasonableness" of an officer's use of force is determined from the perspective of a reasonable officer *on the scene*, or *at the moment*.[9] The Court found that *Graham*'s standard was inapposite to the plaintiff's contention that "in determining reasonableness, the chain of events ought to be traced backward to the officer's misconduct of failing to comply with the standard police procedures for nighttime prostitution arrests." *Greenridge*, 927 F.2d at 792. The Court held that the events that occurred prior to the moment that the officer opened the door and identified herself were not

---

[9]The application of the *Graham* test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest." *Graham*, 490 U.S. at 396.

probative of reasonableness and, therefore, were irrelevant and inadmissible. *Id.*

In *Elliott v. Leavitt*, the Fourth Circuit examined a case where officers used deadly force against Elliott, a drunk driver, after he had been arrested, was secured in a police car and managed to pull a handgun out of his shorts and point it at the officers. *Elliott*, 99 F.3d at 641-42. The Court was dismissive of the plaintiffs' argument that the officers should have searched Elliott better before placing him in the car. *Id.* at 643. It cited *Greenridge* for the holding that "[t]he court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection." *Id.* at 642. In comparing the two cases, the Court specifically noted that "like Officer Ruffin [in *Greenridge*], the officers did not immediately use force but fired only after Elliott ignored the order to drop his weapon." *Id.* at 643. However, prior warning does not appear to be a prerequisite for the use of force, in that the inquiry set forth in *Graham* remains whether the suspect "poses an immediate threat."

The Court also criticized the district court's conjecture that, although Elliott had his hands around the gun and was pointing it at the officers, it is unclear that he intended to use the gun and the officers could have moved father away. *Id.* The Court stated that "[t]his suggestion that the officers might have responded differently is exactly the type of judicial second look that the case law prohibits," and Elliott's specific intent is not relevant to the reasonableness determination. *Id.* "The critical point, however, is precisely that Elliott was 'threatening,' threatening the lives of [the officers]." *Id.*

Plaintiff contends that this case is similar to *Pena v. Porter*, 316 Fed. Appx. 303 (4th Cir. 2009). In *Pena*, the Court of Appeals denied officers qualified immunity where the officers knocked on the door of the plaintiff, who the officers had observed sleeping through the window, and when

18

the plaintiff answered the door with a rifle in his hand, they fired two shots at him and an additional fourteen shots into his home.  *Pena*, 316 Fed.Appx. at 307.  The officers testified that they observed the plaintiff begin to shoulder his gun after they ordered him to drop it.  *Id.* at 308.  However, the Court was required to accept the facts as described by the plaintiff, who claimed that he opened the door with his rifle down, did not threaten the officers in any way, was not warned or commanded to drop his weapon and was shot almost immediately.  *Id.* at 310.   Under the plaintiff's version of the facts, the Court found that the officers were not entitled to qualified immunity because they had no probable cause to believe that he was dangerous, other than the fact that he had a gun.  *Id.* at 311.

The precedent is clear in its holding that the Court may only focus upon the moment force was used in determining reasonableness.  In her response to Deputy Hajash's motion, Plaintiff discusses the events prior to the officers' use of force, specifically the time of night, the officers' attempt to conceal their presence before approaching Mr. Webb and whether the deputies announced their presence.  However, the Court must consider whether the deputies' acts were reasonable at the moment they administered the fatal shootings.  The Court notes that Plaintiff has attempted to highlight factual discrepancies in the record.  Relevant to the instant determination, Plaintiff challenges the deputies' testimony that Mr. Webb was pointing his gun at them and that they announced their presence, and she implicitly challenges whether Mr. Webb even had the gun in his hands.[10]

The first challenge relies on the deputies' recollection of which shoulder Mr. Webb used when raising his gun.  Deputy Hajash's deposition states that Mr. Webb turned counterclockwise

_____

[10]*See, supra,* n. 4.

to face the officers and raised the gun to his right shoulder.[11]  (Hajash Dep. 96).  Deputy Kade's

deposition states that Mr. Webb turned clockwise to face them and with both hands raised the gun

to his right shoulder.[12]  (Kade Dep. 69-73).  Plaintiff contends that these statements create an issue

of fact because Mr. Webb was left-handed and would have raised the gun to his left shoulder.

(Docket 45 at 5).

Because there were no witnesses to the incident, the plaintiff is unable to directly contradict

the deputies' version of events.  The Court must look to "'forensic evidence, the officer's original

reports or statements and the opinions of experts'"  instead of  "simply accept[ing] what may be a

self-serving account by the police officer[s]."  *Ingle ex rel. Estate of Ingle v. Yelton*, 439 F.3d 191,

195 (4th Cir. 2006) (quoting *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir.1994)).  The only other

evidence relating to whether Mr. Webb pointed his gun toward the deputies is the expert opinion of

forensic scientist Edward Hueske, who examined the incident and autopsy reports, the scene, the

---

[11]Hajash's deposition transcript reads as follows:
> A: Yeah.  He put it to his shoulder in the firing position.
> Q: And the firing position is the gun to the right shoulder and the left hand holding the gun.  He was actually holding the gun up?
> A: Yes.

(Hajash Dep. 96-97).

[12]Kade's deposition transcript reads as follows:
> Q: Did he ever get the weapon all the way up to the right shoulder pocket and level?
> A. From what I recall, yes.  Yes.
> . . .
> Q: So your recollection of this is Mr. Webb takes a step backwards and turns to his right while raising - - well, perhaps completing the turns and perhaps simultaneous raising the weapon to his right shoulder while turn [sic] to his right?
> A: Are you saying that he turned to his right and raised the weapon?
> Q: Yes.
> A: He either raised it up at the same time or he turned and raised it up.

(Kade Dep. 69 - 71).

20

deputies' depositions and Mr. Webb's weapon in this case.  (Hueske Report 1, Feb. 18, 2010).  He concluded that the indentation in the left rear portion of the gas piston of the rifle was produced by buckshot fired from Deputy Kade's weapon.  (Hueske Report 3).  Calculating the distance of the shot, where the shots hit Mr. Webb's body and the location of the indentation on the rifle, Hueske opined that "the assault rifle would have to have been in a raised position and directed toward Deputy Kade."  (Hueske Report 3).

The Court considers the expert's findings and notes that Plaintiff has not produced evidence contravening his findings.  Plaintiff's assertions that Mr. Webb would have raised the weapon to his left shoulder, consistent with his dominant hand, are intended to contradict the deputies' testimony that Mr. Webb raised his gun at all.  Keeping in mind that the Court's function at summary judgment stage is not to weigh the evidence and determine its truth, but rather to determine whether a genuine issue of material fact exists, the Court finds that Plaintiff has not identified a genuine issue of material fact as to whether Mr. Webb pointed his weapon at the deputies, based on the inference that he would have raised it to the shoulder of his dominant hand.[13]  Likewise, Plaintiff has not presented any evidence that Mr. Webb was not holding a weapon at all, and there is not a genuine issue of material fact as to whether the deputies fired at Mr. Webb when he was unarmed.  *See Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) (A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another.").

The factual issue of whether the deputies announced their presence before firing at Mr. Webb

---

[13]The Court notes that the statements in the deputies' depositions indicating Mr. Webb raised his gun to his right shoulder were not assertions by the deputies, but rather, in both cases, leading questions that went undenied.  *See, supra,* nn.10-11.

is more relevant to the discussion of immunity from state claims, discussed later in the opinion.[14] Here, as Deputy Hajash points out in his memorandum, that issue is immaterial to the Court's determination of reasonableness.  Relying on Supreme Court precedent, the Fourth Circuit has held that deadly force may be used in a situation where a suspect is threatening an officer with a weapon "where, if feasible, some warning has been given."  *Carr v. Deeds*, 453 F.3d 593, 600 (4th Cir. 2006) (citing *Tennessee v. Garner*, 471 U.S. 1, 11-12, 105 S.Ct. 1694 (1985)).  The issue of whether or not the deputies announced themselves does not bear on the Court's determination of immunity to Plaintiff's excessive force claims under her Civil Rights Violation count.  It is clear from federal precedent that in the context of § 1983 claims, officers' judgments at the moment force is used are afforded significant deference when a suspect is actively endangering the officers' lives.  Moreover, it is questionable whether a warning or announcement prior to the use of force is an event contained in "the moment force is used."

When Deputy Hajash and Deputy Kade approached Mr. Webb, they were aware of reports that he had been in possession of and firing a weapon that evening.  Regardless of Mr. Webb's actual  intent, the officers were faced with him pointing a gun in their direction.  The deputies' actions in firing at Mr. Webb, when facing the immediate threat of the aimed weapon that they understood from earlier reports to be loaded, were reasonable.  There remains the issue of whether Deputy Hajash was reasonable in firing his third shot from an obstructed view after Mr. Webb had fallen to the ground.  The Fourth Circuit analyzed a similar set of facts in its unpublished opinion in *Estate of Rodgers v. Smith*, 188 Fed.Appx. 175 (4th Cir. 2006).  Invoking the ruling in *Elliott*, the Court found that the  defendant officers' actions in continuing to fire at the suspect after he had

---

[14]*See, infra,* Section B(1).

22

fallen to the ground were objectively reasonable.  *Estate of Rodgers*, 188 Fed.Appx. at 183.  The Court held that when the officer fired the additional shots after the suspect had fallen and dropped his weapon, "nothing in the record indicates that [the officer] knew that Rodgers had dropped his weapon, and thus was no longer a threat."  *Id.*  Similarly, the Court finds that Deputy Hajash, in firing his third shot after Mr. Webb had fallen, "was acting to ensure the neutralization of a deadly threat."  *Id*.  Accordingly, the Court finds that Deputy Hajash and Deputy Kade are entitled to qualified immunity for their actions in shooting Mr. Webb, and Plaintiff's federal claims against them solely with respect to their conduct leading up to and including the shooting must be dismissed.

> 2.    Federal Claims Against the Raleigh County Commission

Inasmuch as Plaintiff admits that her Civil Rights Violation count in her Amended Complaint was only directed toward Deputy Hajash and Deputy Kade and she concedes that the Raleigh County Commission is not subject to that count, Plaintiff's federal claims against the Raleigh County Commission are dismissed.

B.    Immunity from State Claims Under the West Virginia Governmental Tort Claims and Insurance Reform Act

The West Virginia Governmental Tort Claims and Insurance Reform Act, West Virginia Code § 29-12A-1, *et seq.,* provides that "Political subdivisions are liable for injury, death or loss to persons or property caused by the negligent performance of acts by their employees while acting within the scope of employment."  W. Va. Code § 29-12A-4(c)(2).  The Act further states that:

(b) An employee of a political subdivision is immune from liability unless one of the following applies:

(1) His or her acts or omissions were manifestly outside the scope of employment or official responsibilities;

(2) His or her acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or

(3) Liability is expressly imposed upon the employee by a provision of this code.

W. Va. Code § 29-12A-5(b).


1.      Deputy Hajash and Deputy Kade


Deputy Hajash relies on *Pethel v. West Virginia State Police*, 568 F.Supp.2d 658 (N.D. W. Va. 2008) in support for his position that he is entitled to immunity under West Virginia Code § 29-12A-5(b) because there was no excessive force.  In *Pethel*, the court found that the plaintiff's failure to establish excessive force was fatal to her state claims.  *Pethel*, 568 F.Supp. at 673.  This Court has found that the deputies' use of force in firing at Mr. Webb at the moment his gun was directed at them was reasonable.  Unlike the determination of qualified immunity for Plaintiff's federal claims, however, the Court is unable to find state authority, nor is any cited by defendants, that the Court must confine its state claims immunity analysis to the moment force is used.  Thus, the Court may consider factors and events that fall outside of the moment Mr. Webb pointed a gun in the deputies' direction, as well as their actions following the shooting.

Immunity is a threshold issue, and whether one is entitled to statutory immunity is a question for the Court.  However, immunity is only appropriate "when the plaintiff has not demonstrated any genuine issues of material fact which must be resolved to determine whether the defendant's actions were reasonable under clearly established law."  *Kelly v. City of Williamson*, 221 W. Va. 506, 511,

655 S.E.2d 528, 534 (2007) (quoting *Baker v. Chaplin*, 517 N.W.2d 911, 916 (Minn. 1994)).

Underlying the determination of immunity under West Virginia Code § 29-12A-5(b) in this case are factual findings the Court is not at liberty to make. Viewing the facts in the light most favorable to Plaintiff, the Court is unable to find that no reasonable jury could return a verdict in Plaintiff's favor. A jury could find that the deputies' response to the "man with a gun" call was unnecessary given that the call was made on a non-emergency line the night before the Fourth of July and the deputies did not observe any gunshots once they were within range of the Webb residence. Weighing the testimony of Plaintiff, Kristi Richmond and Chris Hatfield, who state that they did not hear the deputies announce their presence through their open windows, a jury could find that the deputies failed to announce themselves before firing at Mr. Webb.[15] Examining the evidence that neither deputy confirmed Mr. Webb's death after the shooting and Deputy Hajash told the EMS personnel to wait to work on him until pictures were taken of the scene, a jury could find that Mr. Webb was still alive at the time the EMS personnel arrived, but was denied access to medical care. The deputies' conduct in any of the above actions could be found by a jury to be negligent, thereby imposing liability on the Raleigh County Commission under Section 29-12A-5(c)(2), or wanton or reckless, done with malicious purpose or outside the scope of the deputies' employment, thereby imposing liability on Deputy Hajash and Deputy Kade under Section 29-12A-5(b).

Because genuine issues of material fact exist as to the events leading up to and directly after

---

[15]Unlike the discussion of immunity for Plaintiff's federal claims, the issue of whether the deputies announced their presence before firing at Mr. Webb is a question of fact relevant to state statutory immunity inasmuch as authority in West Virginia does not limit the circumstances to which the Court may examine nor does it expressly prescribe deference to an officer's decision of whether to warn a suspect before using deadly force.

the shooting, summary judgment based on the deputies' entitlement to immunity under West Virginia Code § 29-12A-5(b) is not appropriate.  The Court's holding is limited to the conclusion that Plaintiff  "has submitted sufficient evidence to demonstrate genuine issues of material fact in dispute and evidence to support factual findings that would place the conduct at issue outside the protection of qualified immunity."  *Kelly,* 221 W. Va. at 511 (quoting *Baker*, 517 N.W.2d at 917, n.10).


2.      Raleigh County Commission


The County Commission contends that it is entitled to summary judgment inasmuch as it is immune from liability for the acts of Deputy Kade or Deputy Hajash under West Virginia Code § 7-14A-4.  The Court finds no reason to recede from its earlier opinion that Section 29-12A-4(c)(2) takes precedence over Section 7-14A-4 and maintains that the County Commission may be held liable for the negligence of its employees.  *Webb v. Raleigh County Commission*, No. 5:09-01253 slip op.  at 13-14 (S.D. W. Va. Sept. 16, 2010).  To the extent the Raleigh County Commission may only be held liable for the negligent acts of its employees, the intentional state torts, including Intentional Infliction of Emotional Distress, Tort of Outrage, Civil Conspiracy and Spoliation of Evidence, are dismissed as to the Raleigh County Commission.[16]  However, if a jury were to conclude that Deputy Hajash or Deputy Kade acted negligently and within the scope of their employment in the actions they took, the Raleigh County Commission may be held liable for those

---

[16] "West Virginia does not recognize spoliation of evidence as a stand-alone tort when the spoliation is the result of the negligence of a party to a civil action."  *Hannah v. Heeter*, 213 W. Va. 704, 584 S.E.2d 560, syl. pt. 2 (2003).

26

acts of negligence.

C.      Sheriff Moore and Deputy Tanner

Sheriff Moore and Deputy Tanner assert that they are entitled to summary judgment because they cannot be held liable to Plaintiff based on theories of agency, *respondeat superior* or supervisory liability.  Specifically, Defendants state that Sheriff Moore cannot be held liable for the acts of Deputy Kade and Deputy Hajash under West Virginia Code Section 7-14A-4 because he was not present when the incident between Deputy Kade, Deputy Hajash and Mr. Webb occurred. (Docket 40 at 10-11).  They further state that Sheriff Moore and Deputy Tanner, as supervising officers, may not be held liable for the conduct of their subordinates pursuant to the opinion of the Supreme Court of Appeals of West Virginia in *Robinson v. Pack*.  *Robinson v. Pack*, 223 W. Va. 828, 837, 679 S.E.2d 660, 669 (2009) (holding that supervisory liability in connection with an alleged civil rights violation does not exist).  (Docket 40 at 12).  They repeat their contention from their motion to dismiss that the claims against Sheriff Moore and Deputy Tanner in their official capacities are redundant.  (Docket 40 at 13).  Plaintiff does not respond to Sheriff Moore's and Deputy Tanner's contentions that they are entitled to summary judgment.   Accordingly, Plaintiff's claims against Sheriff Moore and Deputy Tanner must be dismissed to the extent they purport to hold those defendants liable for the conduct of Deputy Hajash and Deputy Kade.

To the extent that Sheriff Moore and Deputy Tanner themselves may have acted negligently or that their actions were wanton or reckless or outside the scope of their employment, the record is devoid of evidence that any actions or neglect of Sheriff Moore and Deputy Tanner caused the

death of Mr. Webb or were sufficiently outrageous to sustain a claim for Intentional Infliction of

Emotional Distress. Thus, for the reasons stated above and those that follow, summary judgment

is appropriate as to Sheriff Moore and Deputy Tanner.

D. Punitive Damages

Defendants Deputy Kade, Raleigh County Commission, Sheriff Moore and Deputy Tanner

assert that they are entitled to summary judgment with respect to Plaintiff's demand for punitive

damages in Count VII of her Amended Complaint. They state that West Virginia Code Section 29-

12A-7 prohibits an award of punitive or exemplary damages against them. (Docket 38 at 13, Docket

40 at 14). Plaintiff responds that punitive damages are only prohibited against political subdivisions

under West Virginia Code Section 29-12A-7, not individual employees. She concedes that punitive

damages may not be imposed upon the Raleigh County Commission. Docket 45 at 16). Section 29-

12A-7 precludes punitive damages against political subdivisions. It states,

> Notwithstanding any other provisions of this code or rules of a court to the contrary,
> in an action against a political subdivision or its employee to recover damages for
> injury, death, or loss to persons or property for injury, death, or loss to persons or
> property caused by an act or omission of such political subdivision or employee:
>
> (a) In any civil action involving a political subdivision or any of its employees as a
> party defendant, an award of punitive or exemplary damages against such political
> subdivision is prohibited.

W. Va. Code § 29-12A-7. Deputy Kade asserts that, to the extent his actions were within the scope

of his employment, he cannot be held liable for punitive damages. (Docket 51 at 12). However,

under a plain reading of the statute, its terms do not limit punitive damages against the employees

of a subdivision. Accordingly, Plaintiff's claim for punitive damages is dismissed as to the Raleigh

28

County Commission only.

E.      Plaintiff's State Law Claims

Defendants Deputy Kade, Raleigh County Commission, Sheriff Moore and Deputy Tanner assert that they are entitled to summary judgment with respect to Plaintiff's individual state law counts of her Amended Complaint notwithstanding the immunities to which they claim they are entitled. The Court will discuss Plaintiff's multitude of state claims and the parties' lackluster arguments and responses thereto in turn.

1.      Wrongful Death, Negligence, Intentional Infliction of Emotional Distress, Tort of Outrage[17]

The genuine issues of material fact discussed in Section B above relate to whether the acts of Deputy Kade and Deputy Hajash were negligent, wanton or reckless, committed with malicious purpose, or outside the scope of their employment. A determination of those factual issues is essential to a determination of Wrongful Death and Intentional Infliction of Emotional Distress. Accordingly, summary judgment as to Deputy Kade and Deputy Hajash on these counts is not appropriate. As discussed above, the intentional torts are dismissed as to the Raleigh County Commission, and it may only be held liable for the negligent acts of the individual defendants

_____

[17] "Intentional Infliction of Emotional Distress" and "Tort of Outrage" are interchangeable causes of action with the same elements. *See O'Dell v. Stegall*, --- S.E.2d ---, 2010 WL 4813671 (W. Va. Nov. 11, 2010).

committed within the scope of their employment.[18]

        2.     Suffering Prior to Death

As to Plaintiff's claim of Suffering Prior to Death (Count II), the West Virginia Supreme Court has held that damages for suffering prior to death may be awarded under a wrongful death claim, but the Court is unaware of any authority that Suffering Prior to Death may be a stand-alone tort claim.  As such, Count II is dismissed.

        3.     Spoliation of Evidence

In her Amended Complaint, Plaintiff alleges that "[t]he Defendants' acts/omissions in an effort to conceal the act/omissions by Defendants Sheriff Moore, Chief Tanner, Deputy Kade and Deputy Hajash constitute spoliation of original evidence in violation of West Virginia common law as articulated in *Hannah v. Heeter*, 213 W. Va. 704, 584 S.E.2d 560 (2003)."  (Amd. Compl. ¶ 78). Defendants Deputy Kade, Raleigh County Commission, Sheriff Moore and Deputy Tanner contend that *Hannah* only imposes liability for spoliation of evidence of a third party.  (Docket 38 at 18; Docket 40 at 16).  Plaintiff responds that Deputy Kade may be held liable for intentional spoliation of evidence  under *Hannah*.  (Docket 46 at 19).  While *Hannah* does provide for the separate tort of intentional spoliation of evidence, Plaintiff has not pointed to any evidence in the record that the elements for this tort have been met.  The elements are:

---

[18] *See supra*, Section B(2).

> (1) a pending or potential civil action; (2) knowledge of the spoliator of the pending
> or potential civil action; (3) willful destruction of evidence; (4) the spoliated
> evidence was vital to a party's ability to prevail in the pending or potential civil
> action; (5) the intent of the spoliator to defeat a party's ability to prevail in the
> pending or potential civil action; (6) the party's inability to prevail in the civil action;
> and (7) damages.

*Hannah*, 213 W. Va. at 717.  Nothing in the evidence before the Court suggests that any defendant

was involved in the willful destruction of evidence, and nowhere has Plaintiff suggested what

evidence was destroyed and by whom.  Accordingly, Plaintiff's Count X for Spoliation of Evidence

is dismissed.

4.      Negligent Hiring, Training and Supervision

The West Virginia Supreme Court of Appeals has applied the following test for a claim

based on negligent hiring:

> [W]hen the employee was hired or retained, did the employer conduct a reasonable
> investigation into the employee's background vis a vis the job for which the
> employee was hired and the possible risk of harm or injury to co-workers or third
> parties that could result from the conduct of an unfit employee? Should the employer
> have reasonably foreseen the risk caused by hiring or retaining an unfit person?

*McCormick v. W. Va. Dep't of Pub. Safety*, 503 S.E.2d 502, 506 (W.Va.1998) (per curiam) (quoting

*State ex rel. W. Va. State Police v. Taylor*, 499 S.E.2d 283, 289 n. 7 (W.Va.1997)).  The Court has

not found state authority for a stand-alone claim for negligent training or supervision.  Plaintiff states

that she has "established by sworn testimony that the defendants violated numerous provision of

their own Policy & Procedure Manual, both before and after the fatal shooting of Mr. Webb."

(Docket  45 at 18-19).  She does not cite to any portions of the record to support this assertion.[19]

Although Plaintiff continues in her response to briefly set forth conduct of Deputy Hajash and

Deputy Kade that she asserts is against the policy, there is no evidence that the elements of negligent

hiring have been met or that her damages resulted from the negligent training of either deputy by

the Raleigh County Commission, Deputy Tanner or Sheriff Moore.  Moreover, Plaintiff's assertion

that "there is evidence generated by Defendant Hajash that the political subdivision attempted to

return him to duty against the opinion of his physician who believed him unfit for police duty[]" is

irrelevant to this claim in that it is a subjective interpretation of the conversation between Sheriff

Moore and Deputy Hajash (if that is what Plaintiff is referring to), and Deputy Hajash's return or

failure to return to work as an officer was a prospective event that did not cause damages to Plaintiff.

Therefore, Plaintiff's Count IV – Negligent Hiring, Training & Supervision is dismissed.


     5.     Civil Conspiracy


     Plaintiff states that there is evidence that the investigation into this incident by the Raleigh

County Sheriff's Department relied on self-serving statements of Deputy Kade and Deputy Hajash

---

[19]Parties submitted to the Court the sealed exhibit of the Sheriffs Department policy manual, numbering in excess of 500 pages.  Plaintiff has not directed the Court to any portion of this tome detailing the specific policies that the Court might find relevant to the actions the deputies took in this case. In the absence of such direction, the Court was unable to find these relevant policies, and is skeptical that they exist inside the manual.  Outside the manual, Deputy Hajash and Deputy Kade both indicated in their depositions that several of the actions they took in handling the gunfire complaint were according to a known policy or practice that was not necessarily contained in a manual.  The deputies' assertions are inapposite to Plaintiff's claim that they were violating any policies. Plaintiff has not challenged the policies themselves as violative of any law or civil rights inasmuch as she has not presented any evidence to that effect and has waived her *Monell* claims against the Raleigh County Commission.

that may not reflect what actually occurred that evening.  (Docket 46 at 20).  Again, she points to

no documents in the record that support this contention, or her contention that " a jury could find

that the defendants conspired to hide the truth as an alternate version of the events of July 3-4, 2006

would provide civil (and potentially criminal) liability for the officers involved and the County

Commission."  (Docket 46 at 20).  The record does reflect that statements were taken of Deputy

Kade and Deputy Hajash both immediately after the incident and several days later.   That is the

extent to which the record can confirm Plaintiff's assertions of civil conspiracy.

   "A civil conspiracy is not a per se, stand-alone cause of action; it is instead a legal doctrine

under which liability for a tort may be imposed on people who did not actually commit a tort

themselves but who shared a common plan for its commission with the actual perpetrator(s)."  *Dunn

v. Rockwell*, 225 W.Va. 43, 689 S.E.2d 255, 269 (W. Va.2009).  There is nothing in the record that

supports a civil conspiracy, nor does Plaintiff indicate that civil conspiracy is pled as the doctrine

is contemplated in West Virginia.  Therefore, Plaintiff's Count IX -- Civil Conspiracy is dismissed.

   6.     Writ of Mandamus

   In her Amended Complaint, Plaintiff requests that the Court enter an Order compelling the

Defendants, individually and collectively, to perform the following now and in the future: comply

with polices and procedures of the Raleigh County Commission; properly screen, supervise and train

potential employees of the Sheriff's Department; properly investigate fatal use of force incidents;

and allow EMS personnel access to patients involved in use of force incidents.  (Am. Compl. ¶ 87).

Defendants Raleigh County Commission, Sheriff Moore , Deputy Tanner and Deputy Kade assert that Plaintiff has not satisfied the conditions for the "drastic remedy" of Mandamus.  Plaintiff does not address this argument in her responses.  The Court finds that Plaintiff has not shown, nor does the record support, that she is entitled to a writ of mandamus and thus, Count XI -- Writ of Mandamus is dismissed.


## V. CONCLUSION


The above findings result in a patchwork of potential liability and questions of fact for the jury.  With respect to Defendants' motions for summary judgment, the Court **ORDERS** as follows:


1.      That Deputy Hajash's Motion for Summary Judgment be **GRANTED** to the extent it seeks immunity for Plaintiff's excessive force claim and **DENIED** to the extent it seeks immunity for Plaintiff's Due Process claims and immunity under West Virginia law for Plaintiff's state  law claims;


2.      That Deputy Kade's Motion for Summary Judgment be **GRANTED** to the extent it seeks immunity for Plaintiff's excessive force claim; and dismissal of claims against him in his Official Capacity; and **DENIED** to the extent it seeks immunity for Plaintiff's Due Process claims;  immunity under West Virginia law for Plaintiff's state  law claims; dismissal of Plaintiff's claims for punitive damages against him; and dismissal of Plaintiff's claims of Wrongful Death, Intentional Infliction of

Emotional Distress and Negligence against him;

3. That the Motion for Summary Judgment of Raleigh County Commission, Sheriff Moore and Deputy Tanner be **GRANTED** to the extent it seeks summary judgment as to Sheriff Moore and Deputy Tanner; dismissal of Plaintiff's federal claims against the Raleigh County Commission; dismissal of Plaintiff's claim for punitive damages against the Raleigh County Commission; and dismissal of Plaintiff's claim of Intentional Infliction of Emotional Distress against the Raleigh County Commission; and **DENIED** to the extent that the Raleigh County Commission seeks immunity under West Virginia Code Section 7-14A-4 or under 29-12A-4(c)(2).

With respect to the universal dismissal of Counts of Plaintiff's Amended Complaint, the Court **ORDERS** that Plaintiff's claims for Suffering Prior to Death (Count II); Tort of Outrage (Count VI); Spoliation of Evidence (Count X); Negligent Hiring, Training and Supervision (Count IV); Agency (Count VIII); and Writ of Mandamus (Count XI) are hereby **DISMISSED.**

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:      December 28, 2010

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

35